```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BARRY HONIG,

              Plaintiff,

         v.                           16 CV 7477 (PGG)

TERI BUHL,

              Defendant.

------------------------------x
                                      New York, N.Y.
                                      February 1, 2017
                                      11:45 a.m.

Before:

                HON. PAUL G. GARDEPHE,

                                      District Judge

                      APPEARANCES

HARDER MIRELL & ABRAMS, LLP
     Attorneys for Plaintiff
BY:  CHARLES J. HARDER
          -and-
DEALY SILBERSTEIN & BRAVERMAN, LLP
     Attorneys for Plaintiff
BY:  AMANDA E. MAGUIRE

HOLLAND & KNIGHT
     Attorneys for Defendant
BY:  CHRISTINE WALZ
       SEAN C. SHEELY
```

1      THE DEPUTY CLERK:  Call the case of Honig v. Buhl, et
2 al.  Is the plaintiff ready?
3      MR. HARDER:  Yes, your Honor.  Charles Harder for the
4 plaintiff Barry Honig.
5      MS. MAGUIRE:  Amanda McGuire, we are local counsel for
6 plaintiff Barry Honig.
7      MS. WALZ:  Christine Walz here on behalf of Teri Buhl.
8      MR. SHEELY:  Sean Sheely, Holland & Knight for Teri
9 Buhl.
10     THE COURT:  Here is a case where the plaintiff, who is
11 a private investor, is alleging he was libeled by Teri Buhl who
12 I understand to be an investigative journalist.  And the false
13 statements, the alleged false statements were made in an
14 article dated May 26, 2016, in which Ms. Buhl made certain
15 statements about Mr. Honig and the possibility of an SEC
16 subpoena having been served on an entity that he is allegedly
17 associated with, and there is a number of statements related to
18 that.
19     So, I will tell you that my impressions from what I've
20 read so far are that the case should be settled.  And so, the
21 question is why.  Why are we here, why is it that the parties
22 have not been able to work out some type of agreement.
23     So, Mr. Harder, from your perspective, why hasn't the
24 matter settled?
25     MR. HARDER:  Your Honor, there have been some initial

1    settlement discussions, and I think that we just need to have a
2    few additional settlement discussions.  And I'm here in New
3    York, and I was planning to speak to defense counsel about that
4    after this court appearance.  We're working on it.
5               THE COURT:  Who wants to speak on behalf of the
6    defendant?
7               MS. WALZ:  Your Honor, I'd like to speak on behalf of
8    Ms. Buhl.  Defendant is confident in the journalism here, and
9    is not currently willing to -- we're certainly willing to
10   discuss settlement, but is not willing to retract any of the
11   statements that have been made, and I think that may prove to
12   be a barrier to settlement here.
13              THE COURT:  Let me give you my impression.  My
14   impression is this litigation is likely to be complex, lengthy,
15   and expensive.  And so that's why I question whether it's
16   rational to spend the next two or three years litigating this
17   case.  I really question whether it's rational.
18              Now, there is a proposal by the defendant to file a
19   motion to dismiss, and I will say that as to certain of the
20   portions of the article that are the basis for the libel suit,
21   it's not entirely clear to me how some of these statements are
22   actionable.
23              Let me ask an initial question before I get into the
24   specific statements.  And that is, is the defendant going to be
25   taking the position that the plaintiff is a limited purpose

1    public figure?
2             MS. WALZ:  Yes.
3             THE COURT:  I assume that in taking that position, you
4    believe you have evidence that he's injected himself in some
5    fashion into the public vortex such that he would qualify as a
6    limited purpose public figure?
7             MS. WALZ:  Yes, your Honor, within this sphere of
8    small cap finance, we believe he is a limited purpose public
9    figure.
10            THE COURT:  All right.  Is plaintiff going to dispute
11   that?
12            MR. HARDER:  Yes, your Honor.  We believe the
13   plaintiff is a private figure.
14            THE COURT:  Okay.  Well, that's another significant
15   legal issue.
16            With respect to the particular statements, one of the
17   cited statements that's alleged to be defamatory is, and I
18   quote "Plaintiff teemed up with his favorite investor,
19   investing partner Michael Brauser."
20            Mr. Harder, what is your theory on how that is
21   defamatory?
22            MR. HARDER:  That's a good question, your Honor.  We
23   believe the evidence may show that Mr. Brauser has a negative
24   public impression, and that by associating my client with
25   somebody like that, that it is defamatory of my client because

1    it's false.  And it would cause people within the investment

2    community to avoid, shun, stay away from my client and cost him

3    economic opportunities.

4            THE COURT:  Well, that frankly sounds like speculation

5    now.  There is going to be a motion to dismiss filed.  You're

6    going to having to demonstrate there are facts pled in the

7    complaint from which I could find that there is a defamatory

8    aspect to being associated with Michael Brauser.

9            So, there is another statement, and I quote, "Market

10   participants sit on the sideline to see if the SEC can get the

11   goods to finally charge Barry Honig."

12           What is your theory on how that's defamatory?

13           MR. HARDER:  Your Honor, if market participants are

14   sitting on the sideline, that means they are not making

15   investments, and that means that the stock price is being

16   depressed, and that's costing Mr. Honig money.  If other people

17   read this and decide that they're going to sit on the sidelines

18   as well, based upon this theory that is false, it is a false

19   predicate from the outset, that the SEC has anything -- any

20   investigation taking place with Mr. Honig, which it doesn't.

21   So --

22           THE COURT:  So when you say "market participants,"

23   could you tell me who the market participants are?  Are these

24   potential investors in something that your client is involved?

25   I don't understand the reference to market participants.  See,

1  I read "market participants" to be simply market participants.
2  But I gather what you are saying is they're potential investors
3  in one of Mr. Honig's businesses.
4      Is that your theory?
5      MR. HARDER:  Well, your Honor, Mr. Honig is an
6  investor himself.  So he invests in companies.
7      THE COURT:  That's one reason why I don't understand
8  the defamatory import.  Because I thought your position is he
9  is a passive investor, he's actually not operating a business
10 himself.  So I don't understand who the market participants are
11 who are sitting on the sidelines.
12     I understand this isn't your article, but it is your
13 theory that this is defamatory.  And I'm asking how is it
14 defamatory?
15     MR. HARDER:  Yes, your Honor.  Mr. Honig is a passive
16 investor in stocks.
17     THE COURT:  Right.
18     MR. HARDER:  One of these stocks is MGT, and he has
19 others as well.  If there is a false impression in the
20 marketplace that the SEC is gunning for Barry Honig, and that
21 market participants, people potentially also investing in
22 companies, are avoiding Barry Honig companies that he's
23 invested in, that causes a depression of his investments.  It's
24 not just his investments, it's other people's as well.
25     But as to the defamation it's causing -- this is

1   something that causes the marketplace to shun Mr. Honig, to

2   avoid him, to not get involved with him, and to not get

3   involved with companies that he's involved with.

4         THE COURT:  I can certainly understand that if these

5   were Mr. Honig's companies, but the way you've presented it is

6   he's just an investor.  He doesn't operate a company.  He makes

7   investments as he deems appropriate.  Is the idea that he

8   controls some of these companies?

9         MR. HARDER:  Well, Ms. Buhl is saying that he does.

10  He does not.  Which is another -- but I believe that this

11  sentence is tied in to some of those other sentences as well.

12        Your Honor, if I may.  If the public that invests

13  believes that Mr. Honig is controlling these companies and that

14  the SEC is investigating him and trying to put him in jail or

15  punish him in some fashion, that depresses the market for that

16  stock.

17        THE COURT:  Well, let me ask you.  Let's get to the

18  bottom of it.  Is there an SEC subpoena that was served on some

19  company that Mr. Honig had an interest in?

20        MR. HARDER:  There is an SEC subpoena.  We don't have

21  a copy of it.  We have discovery out to the defense to provide

22  it to us.  We do have information --

23        THE COURT:  I'm not sure they have it, actually.  But

24  I'll get to that in a moment.

25        MR. HARDER:  Okay.  We do have information, your

1  Honor, that almost every single question has absolutely nothing
2  to do with Barry Honig.  However --
3          THE COURT:  When you say "question," what are you
4  talking about?
5          MR. HARDER:  Requests for production of documents.
6          THE COURT:  That's not a question.  Subpoenas,
7  generally speaking, they either seek testimony from somebody or
8  they seek documents.  They don't contain questions.  They say
9  give me all your documents that concern MGT.  And the recipient
10 is obligated to do that.
11         So that's another thing I don't understand here, is --
12 there are references to what kinds of questions Mr. Honig has
13 been asked.  I don't know what that has to do with because it's
14 in the context of a subpoena, what I understand to be a
15 subpoena for documents.
16         But are you telling me you don't have the subpoena and
17 you don't know what it says?  You don't know what it sought?
18         MR. HARDER:  We don't have the subpoena.  We have
19 spoken to people who have seen the subpoena, and have told us
20 that these statements are completely false, as they have
21 observed the subpoena.
22         THE COURT:  There's another statement, "Barry Honig is
23 pulling out the big legal guns, apparently worried about what's
24 inside that SEC subpoena."  Isn't that opinion?
25         MR. HARDER:  Well, it's a factual statement that he's

1   worried about the subpoena --
2          THE COURT:  What about "apparently worried."  Doesn't
3   that suggest to you that may not be a statement of fact?  When
4   somebody says "apparently," doesn't that sound like almost
5   speculation at that point?
6          MR. HARDER:  Well, your Honor, it sounds like a
7   factual statement that the writer doesn't know if it's true or
8   not.  Which I think if my client is required to prove actual
9   malice, which I don't believe he is, then we would drill down
10  on what is it that give Teri Buhl the appearance that he's
11  worried about the SEC, because he's not worried about the SEC.
12  Did Ms. Buhl have a factual predicate to even make a statement
13  like that?
14         THE COURT:  All right.  Let me speak with Ms. Walz for
15  just a second.  So do you have the subpoena?
16         MS. WALZ:  I do have the subpoena.
17         THE COURT:  Great.  So you can tell us what it
18  actually is about.  So who is the subpoena directed to?
19         MS. WALZ:  The subpoena is directed to MGT Capital.
20         THE COURT:  Okay.
21         MS. WALZ:  Which is the company that Barry Honig has
22  invested in.  It is a subpoena for documents.  It's our
23  position that the Court can take judicial notice of the
24  subpoena when it is attached to the motion to dismiss or that
25  the Court can look at it, because the subpoena is referenced in

1   the complaint. And so we're not hiding ball. We will make the
2   subpoena available. It seeks documents pertaining to Mr. Honig
3   and a number of individuals that he routinely invests in and
4   companies that he has invested in.
5       THE COURT: Now, there are a number of statements that
6   have been challenged by the plaintiff that relate to the
7   subpoena. There's one, it says "90 percent of the regulators'
8   questions are about Honig."
9       What's that about? Can you give me any insight into
10  what that's about?
11      MS. WALZ: That was a sourced quote that was later --
12      THE COURT: Somebody told your client that?
13      MS. WALZ: Yes. And it was later altered in
14  Ms. Buhl's reporting to say that "a large portion of the
15  regulators' questions." So I think non-lawyers referring to a
16  subpoena for documents are looking at it and saying, well, this
17  is about Mr. Honig, not recognizing that they're not questions,
18  they're requests for documents.
19      THE COURT: Now she also apparently repeatedly refers
20  to Mr. Honig as the target of an SEC subpoena or an SEC
21  investigation. Right?
22      MS. WALZ: She does, and although that was again later
23  changed to "subject." But "subject" or "target," that gist or
24  sting means the same I think.
25      THE COURT: What was the goal, if you can tell me, in

1    changing the language from "target" to "subject"?
2            MS. WALZ:  I think when Mr. Honig contacted her or
3    Mr. Honig's lawyers contacted her, there was particular concern
4    with the term "target."  She said, well, subject.
5            THE COURT:  What's interesting to me is that for
6    purposes of the Department of Justice, those are terms of art.
7    And they have very defined meanings.  That may not be true for
8    the SEC.  I suspect it's not.
9            But calling somebody a target for purposes of the U.S.
10   attorney's office investigation has a very specific meaning.
11   Calling somebody a subject has a different meaning.  I don't
12   know whether your client, whether that had anything to do with
13   what was going on here.
14           MS. WALZ:  I think when that issue was raised she said
15   "subject" is most accurate.  Because, again, "target" may
16   have -- may be a term of art.
17           THE COURT:  I'm telling you it is a term of art for
18   purposes of the Department of Justice.  It may not be a term of
19   art at the SEC.  It is definitely a term of art at the Justice
20   Department, and what it means, generally speaking, is that the
21   prosecutor has sufficient information at that time to charge
22   the person.  That's what target means.  And then subject means
23   that your activities are within the scope of the U.S. attorney
24   and grand jury's investigation.
25           So, those terms have specific meaning in the context

1  of an investigation being conducted by the U.S. attorney's
2  office.  As I said, I'm not that familiar with the SEC, and it
3  may be that these terms are not used by the SEC.  But they have
4  a very specific meaning with the Justice Department.
5        MS. WALZ:  But, your Honor, if I may, I think that
6  here the gist or sting of "subject" or "target," given the
7  audience of this blog, is going to be the same.
8        THE COURT:  I guess if that's true, it raises the
9  obvious question why your client decided to change it, if it
10 has no meaning.  So it kind of undercuts -- you just told me it
11 said "target," and there was a complaint by the lawyer and it
12 was changed to "subject."  So that would suggest that your
13 client, at least, thought there was a difference between
14 "target" and "subject" or she wouldn't have changed it.
15       MS. WALZ:  I think she wanted to be accurate in her
16 reporting.  But I think for purposes of the legal analysis
17 related to it, that's a different assessment than her
18 journalism.
19       THE COURT:  There is also a statement, and I quote
20 "Barry uses other people to run a company he is secretly
21 controlling and pays stock pumpers to tout the company without
22 disclosure."
23       That sounds like a statement of fact.  Do you
24 disagree?
25       MS. WALZ:  No, I think there are portions of that that

1    are disclosed facts, and then it's her characterization based
2    on those disclosed facts.
3             THE COURT:  Specifically, when she says "He pays stock
4    pumpers to tout the company without disclosure," that is
5    susceptible to being proven true or false, right?
6             MS. WALZ:  Absolutely.
7             THE COURT:  Also, there is a statement that Mr. Honig
8    is involved in "tons of questionable pump-and-dump deals."
9             Accepting that "tons" is slang or a hyperbole or
10   whatever, whether or not Mr. Honig is involved in lots of
11   questionable pump-and-dump deals, presumably that would be
12   subject to being proven true or false.
13            MS. WALZ:  Yes, I agree.  The tons portion is what is
14   the opinion.  The disclosed facts there are going to be in the
15   fact that he is involved in questionable pump-and-dump deals
16   are based on judicial records that are covered by the fair
17   report privilege.
18            THE COURT:  When you say judicial records, are these
19   complaints that have been filed in cases against Mr. Honig?
20            MS. WALZ:  Yes.
21            THE COURT:  What's the nature of the court records?
22            MS. WALZ:  So there are complaints that allege this,
23   and there is a plea agreement in a case that also alleges it.
24            THE COURT:  Did that involve Mr. Honig?
25            MS. WALZ:  Yes.  I mean -- can you repeat your

1     question?
2              THE COURT:  Yes.  You said there was a plea agreement
3     and my question was did that involve Mr. Honig.
4              MS. WALZ:  Did the --
5              THE COURT:  Plea agreement involve Mr. Honig.
6              MS. WALZ:  The plea agreement did not, but it involved
7     someone who was involved with Mr. Honig who took a plea deal,
8     and in his plea agreement referred to Mr. Honig and his
9     activities with Mr. Honig.
10             THE COURT:  Let me say that today's conference just
11    confirms my view that this case is replete with legal and
12    factual issues that will occupy all of us for several years.
13    And I really question whether that's a good use of everyone's
14    time.
15             The issue, the primary issue that brings us here today
16    is the request to file a motion to dismiss.  I would urge the
17    parties to talk between themselves about some of these
18    statements and make sure that there is both a good-faith basis
19    for alleging that they constitute defamation, and also, to the
20    extent that the defendant wants to move against them, there is
21    a good-faith basis for doing so.
22             With that understanding, Ms. Walz, how long do you
23    want to prepare your motion to dismiss?
24             MS. WALZ:  Could we have until next Friday, your
25    Honor?

1                THE COURT:  Sure.  So next Friday is February 10.  And
2     how long do you want to put in your opposition, Mr. Harder?
3                MR. HARDER:  Two weeks, your Honor.
4                THE COURT:  Okay.  So that would bring us to
5     February 24.  And a week to reply Ms. Walz.
6                MS. WALZ:  Yes.
7                THE COURT:  So that would bring us to March 3.
8                There has been an application to stay discovery while
9     the motion to dismiss is pending.  And I do have a question
10    mark in my mind as to whether a number of the statements at
11    issue will survive a motion to dismiss.  So my inclination is
12    to stay discovery until the motion to dismiss is resolved,
13    because it would be wasteful to have discovery proceed as to
14    statements that I've later determined are not actionable.
15               But, before doing that, Mr. Harder or Ms. Walz, I'm
16    happy to hear people's views on whether discovery should be
17    stayed.
18               MR. HARDER:  Thank you, your Honor.  We would ask that
19    discovery not be stayed.  There are statements that the Court
20    has discussed today that are statements of fact which we
21    believe are defamatory, particularly if and when we prove them
22    to be false, and the defense has in possession information that
23    bears upon these statements.  The subpoena itself, which we do
24    not have, which they do have, and other pieces of information
25    that they've talked about today, such as a plea agreement,

1    complaints and things of that nature.
2             And while we're going down the road of settlement
3    discussions as well, your Honor, it would help us on the
4    plaintiff's side to learn about what information that Ms. Buhl
5    has which she believes supports her statements, so that we can
6    have a full discussion of settlement and also be able to
7    prepare for the case.
8             And with the proposed scheduling order timeline,
9    there's not going to be a great deal of time to undertake
10   discovery.  We're not asking for massive amounts of information
11   to be provided to us, but just things that are relevant to the
12   statements that are defamatory and Ms. Buhl is relying upon in
13   her defense.
14            THE COURT:  Let me ask you this, Ms. Walz.  How would
15   you feel about providing Mr. Harder with, first of all, the SEC
16   subpoena, but also the public record information that you
17   intend to rely on?  That might be conducive to having a
18   rational discussion about the future of the case.  I suspect
19   you'll be attaching most of these things as exhibits to your
20   papers anyway, so I don't think you're giving anything up.  But
21   what do you say?
22            MS. WALZ:  In terms of the subpoena, we certainly
23   planned on attaching that.  And the other documents, the other
24   public documents would be referenced and attached in our motion
25   to dismiss.  The document in terms of the plea agreement was

1    actually linked to from the journalism, from the blog, so I
2    believe that that is publicly available.  So we're not hiding
3    the ball in any way.  So I think, again, we did plan on
4    attaching the subpoena to the motion to dismiss.
5              THE COURT:  I'm going to stay discovery, because if
6    discovery were to proceed, it would clearly go beyond the SEC
7    subpoena and the public record information.  And again, because
8    I'm uncertain whether a number of these alleged defamatory
9    statements are going to survive, I'm reluctant to have the
10   parties spend a lot of time on discovery on it.
11             But what I would urge, given Ms. Walz's confirmation
12   that the subpoena and the public record information will be
13   attached to her papers that are going to be filed in a week and
14   a half anyway, I would urge you, Ms. Walz, to give that stuff
15   to Mr. Harder now so that you can start having a conversation
16   about whether it makes any sense to pursue litigation on all or
17   at least some of these claims.  I'm not convinced it does.  And
18   I do believe that the sooner the parties begin an exchange of
19   the sort that I've suggested, the sooner we can figure out
20   whether there is any possibility of an amicable resolution.
21             So I would urge you to do that.  I'm not ordering you
22   to do that.  As I said, in 10 days' time you'll file your
23   motion and it will have presumably these materials attached
24   anyway.  I'd urge to you do it now, and I'd urge you to have
25   conversations with Mr. Harder now.  It is entirely up to you

1    whether you do or you don't.
2             For present purposes, I will enter a scheduling order
3    that provides for briefing on the schedule that we've agreed
4    to.  It will provide that discovery will be stayed pending
5    resolution of the proposed motion to dismiss.
6             Are there other issues the parties want to raise
7    today?
8             MR. HARDER:  Your Honor, if there is going to be a
9    temporary stay of discovery, then we would ask that the
10   discovery cutoff be extended so that we once the discovery stay
11   is lifted, we would have an appropriate amount of time to be
12   able to complete discovery.
13            THE COURT:  I'm not going to enter a case management
14   plan.
15            MR. HARDER:  Okay, that's fine.
16            THE COURT:  Anything else?
17            MS. WALZ:  No, your Honor.
18            THE COURT:  All right.
19                                  o0o
20
21
22
23
24
25